IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEROY K. KUHNKE,

                      Plaintiff,

   v.

                                                ORDER

RANDAL G. STELZNER, DALIA SULIENE,
VICKI WALKER, LILLIAN TENEBRUSO,           16-cv-629-jdp
PAUL KETARKUS, MEREDITH BIRD,
and KIM CAMPBELL,

                      Defendants.

---

      Plaintiff Leroy Kuhnke, appearing pro se, is a prisoner incarcerated at the Columbia Correctional Institution. Kuhnke developed an abscessed tooth, for which prison officials gave him pain medication and antibiotics. A week after he first reported the problem, a dentist at the prison pulled the tooth. Kuhnke brings this lawsuit alleging that the prison officials failed to promptly treat this problem and adequately treat his pain. Defendants have filed a motion for summary judgment.

      Kuhnke had to wait a week before seeing a dentist about a painful, abscessed tooth. He shouldn't have had to wait that long, but the delay was primarily the result of the prison's dentist calling in sick. None of the defendants ignored Kuhnke's dental problem. I conclude that the undisputed facts show that none of the defendants acted with deliberate indifference to Kuhnke's medical needs, so I will grant summary judgment to defendants and dismiss the case.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and are undisputed unless noted otherwise.

Plaintiff Leroy Kuhnke is a prisoner incarcerated at the Columbia Correctional Institution. Defendants Paul Ketarkus and Kim Campbell held the position of "Nurse Clinician II" in the Health Services Unit at CCI. Defendant Vicki Kamrath[1] was a dental assistant at CCI. Defendant Dalia Suliene was a physician at CCI. Defendant Randal Stelzner was a dentist for the Department of Corrections. Meredith Mashak and Lilian Tenebruso were health services managers at CCI.

On October 13, 2010, Kuhnke began experiencing severe pain around one of his teeth, which had previously had a root canal. Kuhnke's gums near that tooth were swollen and very tender. At about 9:10 p.m., Kuhnke told an officer on his housing unit that he had an abscessed tooth and was in severe pain.

Defendant Ketarkus, a nurse clinician, received a call from Kuhnke's housing unit. Ketarkus says that the housing unit officer reported that Kuhnke was complaining only of a toothache. Kuhnke disputes this, saying that he told the officer that he had an abscessed tooth. Kuhnke cites a log entry from the officer stating that Kuhnke "was complaining he had an absess [sic] tooth." Dkt. 32-1, at 7.[2] Ketarkus told the officer to have Kuhnke submit a dental

---

[1] Defendants Kamrath's and Mashak's last names are now different, and the caption has been amended to reflect the changes, but for the sake of continuity with Kuhnke's allegations and other filings, in the body of this order I will continue to use the names these defendants went by at the time of the events in question.

[2] Defendants say that this log is inadmissible hearsay. I'm not convinced that it is, given the business-records exception to hearsay, see Federal Rule of Evidence 803(6). But even if it is hearsay, Kuhnke is allowed to present evidence on summary judgment that might not be in the proper form, but that could be brought in the proper form at trial. Fed. R. Civ. P. 56(c)(2);

service request form (DSR) because it was not an urgent or emergent problem under the prison dental policy.

However, the prison's dental policy states that "high fever with dental infection" is an example of a "life-threatening condition" that requires "immediate care." Dkt. 49-3, at 2. Neither Ketarkus nor any of the defendants discussed below took Kuhnke's vital signs in the few days after he first reported the problem. The policy also uses "abscess" as an example of the type of "urgent" problem that should be scheduled for appointment the same day, or "[i]f it is not clinically possible to definitively treat the urgent problem that day . . . then appropriate medications including necessary pain medications shall be prescribed until the dentist can provide definitive treatment." *Id.* at 6. To get Kuhnke through the night, Ketarkus had a "colleague" take 24 ibuprofen 200 mg tablets to Kuhnke's housing unit. Ketarkus said that Kuhnke would be seen by a doctor the next day.

The identity of the colleague who brought down the ibuprofen is in dispute. Kuhnke saw the nurse but he does not know for sure who she was. In his discovery materials he referred to her as "Nurse Kim," and described her as "a woman approx. 5'8" tall with blonde hair, approx. 30 years old," and "resembled Britney Spears." *See* Dkt. 64, at 3. Defendant Kim Campbell is approximately five feet eight and she has blonde hair. The record does not show whether she resembles Britney Spears. In October 2010, she was 33 years old. Campbell worked in the Health Services Unit on October 13, 2010, but the staffing records show that

---

*Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014), reh'g denied ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." (emphasis in original)). Defendants also argue that the log entry is vague as to precisely what the officer told the duty nurse, but I must construe such ambiguities in Kuhnke's favor.

she only worked until 1:30 p.m. that day, and the visit to Kuhnke's cell took place at 9:10 that night.

Kuhnke explained to the nurse that he had an abscessed tooth and he was in extreme pain. The nurse responded by telling him to put in a "yellow slip" and walked away stating "I'm not even supposed to be here." There was no dentist, dental hygienist, or medical doctor at CCI at that time of night. Ketarkus did not get another call from the housing unit with further reports of pain from Kuhnke. Kuhnke submitted a DSR, dated October 13, 2010, requesting emergency care, stating, "some sort of absess [sic] has developed under/around my molar that was root canalled years ago. I am experiencing extreme pain." Dkt. 48-1, at 2.

On October 14, 2010, defendant Kamrath, a dental assistant, received a phone call from the housing unit reporting that Kuhnke had been advised by medical staff to see dental staff for a possible abscessed tooth, and that medical staff had given him ibuprofen. Kamrath told unit staff that Kuhnke was scheduled to be seen the next morning because there was no dentist on-site on October 14.

Kuhnke says that his pain worsened, he developed dry heaves and chills, he could not eat or drink, and his "mental health deteriorated . . . [and] he began praying for death." Dkt. 59, at 4.

Kuhnke's DSR was received by dental staff on October 15. Kamrath responded to Kuhnke, stating that a "priority appointment" was made. Later that morning, an officer reported that Kuhnke was complaining of dental pain and asking to be sent to dental services immediately. Kamrath authorized Kuhnke to be sent to dental services. Kuhnke arrived at about 10 a.m. Kamrath took an x-ray of his lower right teeth. She thought that tooth 30 appeared abscessed. Because the on-site dentist had called in sick that day, Kamrath showed

4

the x-ray to defendant Suliene, a physician. From the x-ray and reported symptoms, Suliene prescribed Clindamycin (an antibiotic) and Tylenol III. She immediately gave Kuhnke a "loading dose" of Clindamycin. Defendant Stelzner, a dentist, says that the use of an antibiotic for several days before pulling the tooth is appropriate dental practice.

Kamrath scheduled Kuhnke for a follow-up appointment on Monday, October 18, 2010 (dental services is closed on the weekend) and for an appointment with the dentist on Wednesday, October 20, 2010, the next time the dentist was scheduled to be on-site.

On October 18, Kamrath saw Kuhnke for a follow-up. Kuhnke reported that his tooth was still bothering him and he was concerned of running out of the antibiotic. She retrieved some doses of the antibiotic that had already been placed in the housing unit's mail for Kuhnke and gave it directly to him. In her notes, she also states that Kuhnke would receive Tylenol III and a box of ibuprofen, to last him until he could be seen by the dentist.

On October 20, 2010, defendant Stelzner saw Kuhnke in the dental services unit, discussed the procedure to extract his abscessed tooth, obtained his informed consent, administered local anesthesia, and extracted his tooth. Kuhnke's medical chart does not show complaints of pain at the extraction site following the extraction.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692

5

(7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The parties agree that Kuhnke's abscessed tooth was a serious medical need.

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

**A. Defendant Ketarkus**

Defendant Ketarkus was the first defendant to hear of Kuhnke's problem, at about 9 p.m. on October 13, 2010. Defendants say that Kuhnke complained only of a toothache. If it were undisputed that Kuhnke merely had a toothache, summary judgment would clearly be warranted because Ketarkus ordered ibuprofen for a relatively routine problem and said that he would be seen by a dentist the next day. But Kuhnke says that he told unit staff that he had an abscessed tooth and was in severe pain. That is a disputed issue of material fact that I must resolve in Kuhnke's favor at the summary judgment stage.

So the question is whether, given the circumstances here—no dentist or doctor was at the prison by that time of night—Ketarkus acted with deliberate indifference by providing ibuprofen to Kuhnke rather than do something more immediate like examining him, calling the on-call physician, or sending him to the emergency room. This depends in large part on how serious of a condition his abscessed tooth was.

Kuhnke is not a medical professional himself, but he cites to the prison's dental policy stating that "high fever with dental infection" is an example of a "life-threatening condition" that requires "immediate care." Dkt. 49-3, at 2. Both sides discuss *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015), a recent decision in a similar case about prison staff's response to a prisoner's abscessed tooth, in which the court stated, "Because the bacteria in an abscessed tooth can spread to other vital organs and even cause death, prompt treatment is imperative." And defendant Stelzner states, "If left untreated with antibiotics, the infection can spread to the surrounding tissue and bones, creating a very serious and possibly life-threatening health condition." Dkt. 54, at 4.

7

But Kuhnke did not report that he had a high fever; abscesses without fever are included in the policy as an example of an "urgent" condition not necessarily mandating emergency outside treatment. And the delay here is very minor compared to the delay discussed in *Dobbey*: there the plaintiff received no treatment, not even pain medication, for about four weeks. *See id.* at 939–40. Kuhnke does not bring state-law claims for medical malpractice, so the question is not whether Ketarkus was *negligent* in failing to take further steps to evaluate or treat him. The question is whether Ketarkus's decision was "so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). From the facts presented here, no reasonable juror would think that such a minimal delay—at the time, Ketarkus envisioned Kuhnke being treated the next day—would amount to deliberate indifference, particularly where Ketarkus sent him ibuprofen to blunt the pain overnight.

**B. Defendant Campbell**

Kuhnke brings a claim against defendant Campbell, the nurse who delivered the ibuprofen sent by Ketarkus, and who told Kuhnke to file a medical slip without providing more immediate treatment. This defendant was originally one of four "John Doe" defendants whose identities were unknown.[3] It is still unclear whether Kuhnke has landed on the correct identity for this defendant, because defendants produce documents showing that Campbell was not working on the night of October 13, 2010. But at summary judgment, I must draw reasonable

---

[3] Kuhnke never amended his complaint to identify the other three Doe defendants, so his claims against them will be dismissed.

8

inferences from the facts in Kuhnke's favor. He says that a woman resembling Campbell's description was the person who handed him the ibuprofen and told him to file a medical slip.

Defendants contend that Kuhnke's assertion that Campbell interacted with him that night "is nothing more than his subjective belief that whoever he saw that night was Campbell" and is not enough to stave off summary judgment. Dkt. 65, at 3. If the evidence produced thus far showed that Kuhnke was truly mistaken about the identity of the nurse, I would likely let him amend his complaint to include the proper defendant, rather than grant summary judgment.[4] But here, it is not clear that this is a case of mistaken identity. The parties have gone back and forth in discovery attempting to identify someone matching the description provided by Kuhnke, and there does not appear to be any alternate theory about who gave him the ibuprofen. Records showing that Campbell was not present that evening is evidence that she was not there, but Kuhnke provides his own evidence that she was there: his own testimony and Campbell's physical description. Kuhnke's statement that she said "I'm not even supposed to be here" is evidence that Campbell may have worked outside of her official schedule. Kuhnke may not be absolutely sure that the woman matching his description is Campbell, but it is a reasonable inference from the facts in the record.

The problem for Kuhnke is that my deliberate indifference analysis regarding Ketarkus applies to Campbell, too. Kuhnke states that Campbell saw him in pain and told him "I'm not

---

[4] Kuhnke filed a motion to stay a summary judgment ruling on this claim pending his receipt of various prison records, including the "shift commander's log," that might contain more information about who entered and left the prison on October 13, 2010. Dkt. 67. He also filed a motion for leave to file his reply brief on this motion three days late, Dkt. 71, which I will grant. I will deny Kuhnke's motion to stay because it has been mooted by his receipt of the materials, and also because I conclude in this opinion that a reasonable inference could be drawn from the summary judgment record that Campbell was indeed the nurse who delivered the medication to him.

even supposed to be here" and to file a medical slip. But she also delivered the ibuprofen to treat the pain Kuhnke was complaining about, under instruction from Ketarkus, who had already made a decision on how to treat Kuhnke's problem. As discussed above, it was not deliberate indifference to provide Kuhnke pain medication instead of sending him to the emergency room or consulting the on-call doctor.

**C. Defendant Kamrath**

The day after Kuhnke's first report of pain, October 14, defendant Kamrath, a dental assistant, learned about Kuhnke's problem and the Health Unit Staff's treatment decisions the night before. Kamrath told unit staff that the dentist was not in that day and that Kuhnke was scheduled to be seen the next morning. But the dentist called in sick on October 15. Kamrath intervened twice in Kuhnke's care that day. Kamrath received a DSR from Kuhnke and responded by stating that he had a "priority appointment." Then, later that morning, when the housing unit called and said that Kuhnke continued to complain about his dental pain and asked to be seen immediately, Kamrath authorized him to come to dental services for an x-ray. She thought the tooth was abscessed so she sent him to see defendant Suliene because the dentist was not there.

As with the defendants discussed above, Kuhnke alleges that Kamrath did not move fast enough to get him care. But again, I conclude that Kamrath did not act with deliberate indifference by failing to immediately send him to a doctor. On October 14, unit staff explained what medical staff had done to treat Kuhnke the night before. Kamrath set Kuhnke for an appointment the next day, when the dentist would be in. That was reasonable given that she knew that he had received medication for his pain.

Then, the next day, October 15, she responded to his DSR by setting him for a "priority appointment." Kuhnke contends that the term "priority appointment" means nothing because it did not fit within the framework the dental policy used to categorize dental conditions: "Urgent," "Essential Routine," "Routine," "Prosthetic Routine," and "Hygiene." But even assuming that Kamrath failed to follow the policy framework, a violation of an internal prison policy does not in itself violate the Eighth Amendment. *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004). The question is whether Kamrath acted with deliberate indifference. Setting him for a "priority appointment" shows her regard for his health needs.

Then, when she heard from unit staff that Kuhnke was continuing to complain about his dental pain and asking to be seen immediately, Kamrath authorized him to come to dental services for an x-ray, and she ultimately referred him to defendant Dr. Suliene because the dentist had called in sick. No reasonable jury could conclude that Kamrath was deliberately indifferent when she took steps to have Kuhnke seen by a doctor.

**D. Defendant Suliene**

Kuhnke contends that Suliene, a doctor, acted with deliberate indifference by failing to examine him, because she did not see firsthand exactly how serious the abscess was. But this is not entirely true; Suliene made her treatment decision based in part off the x-ray results, which showed the abscessed tooth. Again, Kuhnke is not proceeding on medical malpractice claims, so I take no position on whether it would have been the best practice for Suliene to physically examine Kuhnke first. Here, she prescribed him stronger pain medication as well as an antibiotic to treat the underlying infection, which defendant Stelzner says was appropriate treatment. Even without Stelzner's testimony, no reasonable jury could look at Suliene's course of treatment and conclude that she acted with deliberate indifference, because she acted to

treat both the infection and the pain associated with it. I will grant summary judgment to defendants on this claim.

Kuhnke originally also alleged that the Tylenol 3 was not the most effective pain medication he could have received given the circumstances, but the Eighth Amendment does not mandate the best possible care; the question is whether Suliene knew that her choice would be ineffective. Kuhnke does not develop any facts on this point, so the only reasonable inference from the record is that Suliene genuinely attempted to alleviate Kuhnke's pain. I will grant defendants summary judgment on this claim as well.

**E. Individual-capacity claim against defendants Stelzner and Mashak**

In a February 21, 2018 order, I dismissed Kuhnke's claim that defendant Stelzner pulled his tooth against his wishes for a less invasive procedure and without providing Kuhnke adequate pain management, because Kuhnke failed to exhaust his administrative remedies on that claim.

Kuhnke also brought a claim that "the CCI dentist in his official capacity" and defendant Mashak did not treat him further to restore the missing tooth with a bridge. I initially considered the clam against the "CCI dentist" as a potential claim against Stelzner in his individual capacity, but stated the following about it in the February order:

> The exhaustion briefing suggests that Kuhnke's claims about a bridge may have been aimed at 2016 conduct by Mashak and a Dr. Thorpe rather than Stelzner. Defendants say that Kuhnke's 2016 claims are not part of this lawsuit, so he has not exhausted the bridgework claim. But because Kuhnke's complaint was vague about the timing of his request for bridgework, I cannot conclusively say that this is so. If Kuhnke meant to bring claims about 2016 events, then Thorpe rather than Stelzner would likely be the correct defendant. And it remains unclear whether Kuhnke even wishes to bring an individual capacity claim against a dentist for this claim because he originally phrased the identity of the wrongdoer as "the CCI dentist in his official capacity." Without

> knowing more precise contours of this claim, I cannot say whether
> Kuhnke has exhausted it. I will give him a short time to provide a
> supplement to his complaint explaining (1) who the proper
> defendants for his bridgework claim are; (2) when those
> defendants violated his rights; and (3) how he exhausted this
> claim. Defendants will be given a chance to respond to that filing.

Dkt. 44, at 4–5.

Kuhnke did not supplement his complaint, and he does not discuss the bridgework claim in his brief other than to request that his claim against Mashak be dismissed. I will dismiss this claim as abandoned.

## F. Official-capacity claim against defendants Mashak and Tenebruso

Kuhnke's final claim is one for injunctive relief against Heath Services Unit managers Mashak and Tenebruso in their official capacities for maintaining policies that understaffed dental professional positions and failed to provide off-site treatment for dental emergencies. I previously explained to Kuhnke that to show that he is entitled to injunctive relief on his official capacity claims, he would need to show that a policy or custom of the state played a part in the alleged constitutional deprivation. *See* Dkt. 6, at 5 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). But my analysis above shows that there is no underlying constitutional violation; the medical and dental staffs did not violate his constitutional rights by failing to get him treatment more promptly.

Even if the accumulated delays in this case, independent of any one defendant's actions, were enough to violate the Eighth Amendment, Kuhnke comes nowhere close to showing that the delay was the result of prison policy, particularly in light of the rigorous standards this court must uphold in granting injunctive relief in the prison context. *See* 18 U.S.C. § 3626(a)(1)(A) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular

plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."); *see also Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) ("[P]rison officials have broad administrative and discretionary authority over the institutions they manage." (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983))). So I will grant summary judgment to defendants on this claim.

## G. Qualified immunity

Because I am granting summary judgment to defendants on the merits of each of Kuhnke's claims, I need not address defendants' qualified immunity defense.

## H. Pretrial submissions

Defendants have filed a motion to stay the pretrial-submission deadlines. Dkt. 72. But because I am dismissing the case at summary judgment, I will deny this motion as moot.

ORDER

IT IS ORDERED that:

1. Plaintiff Leroy Kuhnke's motion for an extension of time to file his reply brief in support of his motion to stay a summary judgment decision, Dkt. 71, is GRANTED.

2. Plaintiff's motion to stay a summary judgment decision on his claim against defendant Kim Campbell, Dkt. 67, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 45, is GRANTED.

4. Defendants' motion to stay the pretrial-submissions deadlines, Dkt. 72, is DENIED as moot.

5. The clerk of court is directed to enter judgment for defendants and close this case.

Entered July 18, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge